**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| MIKELA JACKSON, as Next Friend of | ) | |
| D.T., a minor, A.T., a minor, and B.T., a minor, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| JEAN KELLY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| CITY OF SIKESTON, MISSOURI, | ) | *Jury Trial Demanded* |
| Please Serve: | ) | *Under Fed. R. Civ. P. 38(b)* |
| Mayor Greg Turnbow | ) | |
| 105 East Center Street | ) | |
| Sikeston, Missouri 63801 | ) | |
| | ) | |
| And | ) | |
| | ) | |
| CHIEF JAMES B. MCMILLAN, | ) | |
| Please Serve: | ) | |
| 201 S. Kingshighway | ) | |
| Sikeston, Missouri 63801 | ) | |
| | ) | |
| And | ) | |
| | ) | |
| JOSH S. GOLIGHTLY, | ) | |
| Please Serve: | ) | |
| 201 S. Kingshighway | ) | |
| Sikeston, Missouri 63801 | ) | |
| | ) | |
| And | ) | |
| | ) | |
| MATTHEW R. COTNER, | ) | |
| Please Serve: | ) | |
| 201 S. Kingshighway | ) | |
| Sikeston, Missouri 63801 | ) | |
| | ) | |
| And | ) | |
| | ) | |
| JON R. BROOM, | ) | |
| Please Serve: | ) | |

201 S. Kingshighway                                )
Sikeston, Missouri 63801                           )
                                                   )
                              Defendants.           )

## COMPLAINT FOR WRONGFUL DEATH

COME NOW Plaintiffs, MIKELA JACKSON, as Next Friend of D.T., a minor, A.T., a minor, and B.T., a minor, and JEAN KELLY, by and through their undersigned counsel, and hereby state the following in support of their Complaint for Wrongful Death against the above-named Defendants:

## INTRODUCTION

1.      This is a civil action filed pursuant to section 537.080 *et seq*. R.S.Mo. (1979), which is commonly referred to as the state of Missouri's Wrongful Death Statute. Plaintiffs claim all available damages under the Missouri Wrongful Death Statute.

2.      Plaintiffs, D.T., A.T. and B.T., all minors, are the surviving natural children of Denzel Taylor ("Taylor") and Mikela Jackson ("Jackson").

3.      Jean Kelly ("Kelly") and Milton Taylor ("Milton") are the surviving natural parents of Taylor.

4.      Plaintiffs D.T., A.T., B.T., all minors, by and through their parent and next friend Jackson, and Kelly are members of the wrongful death class eligible to advance this suit.

5.      On or about April 29, 2020, defendant police officers Josh S. Golightly ("Golightly"), Matthew R. Cotner ("Cotner") and Jon R. Broom ("Broom") (collectively, the "defendant officers") unjustifiably shot and killed Taylor, and in so doing, used an unnecessary and unreasonable amount of force in violation of Taylor's constitutionally guaranteed right to life.

6.      On said date, Taylor was an unarmed, twenty-three-year-old, African-American male who sustained fatal gunshot wounds.

2

7.      The defendant officers were each employed by Defendant City of Sikeston ("Sikeston" or the "City") at the time that they shot and killed unarmed Taylor.

8.      At the time he was shot and killed, Taylor was the father of two young daughters with another daughter who was born after Taylor was killed.

9.      Defendant Police Chief James B. McMillan ("McMillan") maintained general supervision of the defendant officers, and he was also responsible for their hiring, training, and retention, along with defendant City.

10.     Acting under color of law, the defendant officers deprived Taylor of his well-established civil rights protected by the United States Constitution and the state of Missouri Constitution.

11.     Plaintiffs seek compensatory damages, exemplary damages, and attorneys' fees and costs, in addition to any other relief this Honorable Court deems just and proper under the circumstances.

## PARTIES

12.     Plaintiffs D.T, A.T. and B.T. are the natural children and Kelly is the natural mother of decedent Taylor. Jackson is the natural mother and next friend of Taylor's minor children.

13.     At all material times herein, Plaintiff Jackson, as mother and next friend of D.T., a minor, A.T., a minor, and B.T., a minor, resided in Scott County, Missouri.

14.     At all times relevant hereto, Jackson was Taylor's fiancé.

15.     At all material times herein, Plaintiff Kelly resided in Cook County, Illinois.

16.     Defendant City of Sikeston, Missouri is a city of the third class incorporated pursuant to Missouri Statutes and the Missouri Constitution. The Sikeston Department of Public

Safety (hereinafter, the "Sikeston Police Department") is an official division of the defendant City of Sikeston.

17.     At all relevant times herein, defendant City employed defendants McMillen, Golightly, Cotner and Broom, including at the time the defendant officers shot and killed Taylor.

18.     Defendant Golightly at all pertinent times herein was acting within the course and scope of his employment with defendant City and was acting under color of law.

19.     Defendant Golightly is being sued in his individual and official capacities.

20.     Defendant Cotner at all pertinent times herein was acting within the course and scope of his employment with defendant City and was acting under color of law.

21.     Defendant Cotner is being sued in his individual and official capacities.

22.     Defendant Broom at all pertinent times herein was acting within the course and scope of his employment with defendant City and was acting under color of law.

23.     Defendant Broom is being sued in his individual and official capacities.

24.     Defendant McMillen at all pertinent times herein was acting within the course and scope of his employment with defendant City and was acting under color of law as the supervisor of defendant City's police officers, including the defendant officers.

25.     Defendant McMillen was responsible for and had express and implied authority to make policies for defendant City.

26.     Defendant McMillen also had the authority to hire, train, supervise, discipline, and effect the retention determination(s) in regard to defendant City's law enforcement officers.

27.     Defendant McMillen is being sued in his individual and official capacities.

## **VENUE**

28.     Venue is proper in this judicial circuit because all acts or omissions complained of occurred herein. Venue is also proper pursuant to V.A.M.S. § 508.010 and the Constitution of the state of Missouri. Plaintiffs are the proper parties to bring this action for the wrongful death of their father and son, Taylor, which occurred within the Eastern District of Missouri.

## SUBJECT-MATTER JURISDICTION

29.     This Court has subject-matter jurisdiction over the claims herein pursuant to MO Const. Art. V, § 14.

30.     This Court has jurisdiction over federal questions pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. §§ 1983, 1988. Plaintiffs further invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to adjudicate pendent state law claims.

## THE KILLING OF DENZEL TAYLOR

31.     On April 29, 2020, at approximately 1:40 a.m., the defendant officers were dispatched to 233 Dorothy Street in Sikeston, Missouri due to an alleged disturbance involving a handgun.

32.     Upon arrival, defendants Broom and Golightly encountered Milton, who had apparently been shot.

33.     Milton's wife, Lisa Taylor ("Lisa"), told defendants Broom and Golightly that Milton and Taylor got into a dispute and that Taylor shot Milton.

34.     Lisa told defendant Golightly that she had gone to bed and did not see the alleged altercation between Milton and Taylor.

35.     Defendant Broom asked Lisa where Taylor was and she stated she did not know.

36.     Lisa told defendant Broom that she did not know whether Taylor had left the residence with a gun.

37.    Lisa and Milton advised the defendant officers that they were surprised Taylor would do this.

38.    Lisa and Milton did not tell the defendant officers that they believed that Taylor was a threat to himself or to anyone else.

39.    Defendant Broom called the on-call detective defendant Cotner to the scene.

40.    Defendants Golightly and Cotner began to process the scene.

41.    Defendant Broom's role was to retrieve items for the detectives and to make sure the scene was secure.

42.    Approximately 45 minutes to an hour after the initial call, the defendant officers saw an individual on foot at the intersection at Dorothy and Scott Streets, who turned out to be Taylor.

43.    Defendant Golightly was wearing a department-issued body camera during this encounter.

44.    Upon information and belief, defendant Broom and defendant Cotner were either not wearing their body cameras, or they failed to switch on the audio/video of their body cameras.

45.    The defendant officers immediately drew their guns and walked towards Taylor.

46.    The defendant officers pointed their guns at Taylor and screamed at him.

47.    The three defendant officers approached Taylor, each with their guns pointed at him.

48.    The defendant officers' use of such aggressive tactics caused an unnecessary and unwarranted escalation of this interaction.

49.    Such tactics are also indicative of the aggressive mindsets of the defendant officers towards some citizens in situations that begin as non-threatening.

50. Taylor was a significant distance away from each of the defendant officers when they first saw him, however the defendant officers walked towards him and closed the gap between them.

51. As the defendant officers approached Taylor, Taylor began to slowly take steps backwards, as can be seen on defendant Golightly's body camera footage.

52. The defendant officers continued to approach Taylor with their guns drawn as he slowly walked backwards.

53. During this exchange, Taylor never attempted to physically engage the defendant officers in any manner.

54. Between 0:21 and 0:26 on defendant Golightly's body camera footage, the defendant officers walked forward towards Taylor with their guns drawn.

55. Between 0:21 and 0:26 on defendant Golightly's body camera footage, Taylor took approximately eight steps backwards away from the defendant officers.

56. At 0:26 on defendant Golightly's body camera footage, Taylor stopped and stood in the northwest corner (right-rear from defendant Golightly's perspective) of the intersection at Dorothy and Scott Streets.

57. When Taylor stopped backpedaling, the defendant officers continued to walk towards Taylor with their guns drawn.

58. At 0:30 seconds of defendant Golightly's body camera footage, defendant Golightly switched on the audio of his body camera as he continued to walk towards Taylor.

59. At 0:31 seconds of defendant Golightly's body camera footage, the defendant officers continued to approach Taylor and one of them yelled, "Show me your hands now!"

60.    At 0:31 seconds of defendant Golightly's body camera footage, Taylor took a step backwards.

61.    At 0:32 seconds of defendant Golightly's body camera footage, another defendant officer yelled, "Hands out of your pockets!"

62.    At 0:32 - 0:34 seconds of defendant Golightly's body camera footage, Taylor took approximately two or three steps backwards.

63.    At 0:34 seconds of defendant Golightly's body camera footage, one of the officers yelled, "Now!"

64.    At 0:34 seconds of defendant Golightly's body camera footage, Taylor raised his empty left hand in the air, see video still below:



65.   At 0:35 seconds of defendant Golightly's body camera footage, defendant Golightly fired two shots at Taylor.

66.   At 0:36 seconds of defendant Golightly's body camera footage, Taylor turned his back toward the defendant officers and hunched over.

67.   At 0:37 seconds of defendant Golightly's body camera footage, defendant Golightly fired a third shot at Taylor and Taylor fell to the ground.

68.   At 0:38 seconds of defendant Golightly's body camera footage, Taylor covered his head with both of his empty hands, see video still below:



69.   As of at least 0:38 seconds of defendant Golightly's body camera footage, Taylor's hands were empty and plainly visible to each of the defendant officers.

70.     Between 0:39 – 0:42 seconds of defendant Golightly's body camera footage, all three defendant officers rapidly fired bullet rounds into the back of Taylor's body and he lay on the ground.

71.     In all, the defendant officers fired approximately forty (40) shots at Taylor.

72.     Approximately thirty-seven (37) of those shots came after Taylor's hands were visibly empty.

73.     The defendant officers never confirmed whether Taylor was armed or not before firing upon him.

74.     Taylor was unarmed at the time the defendant officers fired upon him.

75.     Taylor never ran from the defendant officers.

76.     Taylor never attempted to run or get away from the defendant officers.

77.     Taylor never physically touched any of the defendant officers.

78.     Taylor never attempted to physically touch or strike any of the defendant officers.

79.     Taylor never verbally threatened the defendant officers.

80.     Taylor never yelled or aggressively raised his voice at the defendant officers.

81.     Taylor never pointed a firearm at the defendant officers.

82.     Taylor never brandished a firearm.

83.     Taylor never made any abrupt physical gestures towards the defendant officers.

84.     Taylor never initiated any type of physical confrontation with the defendant officers.

85.     Once the defendant officers began walking toward Taylor at approximately 0:18 seconds on defendant Golightly's body camera footage, Taylor never once walked towards or made any gesture towards them.

86.     Defendant Golightly walked towards Taylor with his gun drawn and pointed at Taylor from 0:18 seconds on his body camera footage until approximately 0:33 seconds without ever stopping.

87.     Defendant Golightly opened fire on Taylor approximately two seconds after he stopped walking towards him.

88.     The defendant officers never confirmed whether Taylor was armed.

89.     In fact, Taylor did not have a firearm on his person at the time the defendant officers shot him.

90.     The defendant officers shot approximately 40 times throughout the incident in violation of Taylor's constitutionally guaranteed rights to (1) be free from the use of excessive force, (2) the right to life, (3) due process under the law, and (4) equal protection under the law.

91.     The defendant officers shot haphazardly and recklessly at Taylor, and errant bullets struck the wall of a residence near the intersection.

92.     On autopsy, Taylor was found to have sustained approximately 28 gunshot wounds from either bullets or fragments.

93.     Only one of those gunshot wounds had a front-to-back trajectory.

94.     The remaining 28 bullets/fragments entered Taylor's body from the back or lateral pathways.

95.     Forensic pathologist Russell Deidiker, M.D. performed Taylor's autopsy and determined that the manner of death was homicide, and that the cause of death was multiple gunshot wounds.

96.     Dr. Deidiker also noted that "None of the gunshot wounds showed evidence of close-range fire."

97.     After the defendant officers shot Taylor, they each went over to Taylor and quickly determined that he was not armed.

98.     However, the defendant officers did not provide any direct medical assistance to Taylor for at least five minutes after the shooting.

99.     Instead, the defendant officers left Taylor lying face down in a puddle, handcuffed and struggling to breathe.

100.    Defendant Golightly did not attempt to render first aid to Taylor.

101.    Defendant Golightly did light and smoke a cigarette while Taylor struggled to breathe.

102.    General Order 13 of the Sikeston policies and procedures states that officers involved in shootings, "shall immediately determine the physical condition of any injured person and give first aid as appropriate."

103.    Contrary to mandatory policy and procedure, only when the EMS sirens are heard in the background, and over five minutes after the shooting, does an officer finally go over to Taylor and attempt to render medical aid.

104.    Taylor was alive from the time he was shot at least until the paramedics arrived.

105.    Paramedics determined that Taylor had a weak pulse when they arrived.

106.    The paramedics were not able to place the cardiac monitor electrodes on Taylor because his body was so wet from lying in a puddle that the electrodes would not stay on him, and they had to dry him off with a towel.

107.    Ultimately, the paramedics were not able to resuscitate Taylor and he passed away at the scene.

108.    Prior to his death, Taylor endured a substantial amount of conscious pain and suffering from the moment he was first shot by defendant Golightly until his body ultimately succumbed to death by 28 gunshot wounds.

109.    Taylor's lifeless body remained on the damp ground in an undignified manner for hours as blood streamed from his back, chest, abdomen, pelvis, and thighs onto the intersection of Dorothy and Scott streets.

101.    Taylor was never told he was under arrest nor warned he would be shot by the defendant officers.

111.    Taylor was beginning to comply with the defendant officers' commands at the time they shot him.

112.    Taylor was not in the act of committing a serious and/or dangerous violent crime at the time he was shot, and he was not a "dangerous fleeing felon."

113.    Taylor was at a substantial distance from the defendant officers at the times he was shot.

114.    It was the defendant officers who intentionally closed the gap between themselves and Taylor.

115.    There is no evidence to suggest Taylor intended to cause serious bodily harm or death to the officers on the scene or a member of the general public.

116.    The defendant officers effectively had Taylor surrounded with their guns drawn.

117.    Each of the defendant officers had a duty to act in an "objectively reasonable manner" while engaging with Taylor who was clearly a person in need of help.

118.    The defendant officers are the ones who escalated the confrontation with Taylor.

13

119.     The defendant officers and Sikeston have made statements that blatantly contradict the facts that are seen on defendant Golightly's body camera footage.

120.     The defendant officers and/or Sikeston have made false statements that Taylor came towards and approached the defendant officers.

121.     Defendant Golightly made a false statement that he saw Taylor remove an object from his pocket and point it at defendants Golightly and Cotner.

122.     Defendant Golightly made a false statement that Taylor said they were going to have to kill him.

123.     Defendant Golightly made a statement that at some point during his shooting of Taylor he changed his magazine, but that he had no recollection of doing this. This indicates that defendant was recklessly and wantonly shooting at Taylor with no coherent purpose.

124.     Defendant Cotner made a false statement that he knew that Taylor had left the initial scene with a gun.

125.     Defendant Cotner made a false statement that Taylor regained his footing and "started to lunge or run towards Golightly."

126.     Defendant Broom made false statements that Taylor was becoming more aggressive and that he "just kept approaching them."

127.     Defendant Broom made false statements that Taylor "wanted us to kill him."

128.     The defendant officers and/or Sikeston have made false statements that Taylor escalated the confrontation with the defendant officers.

129.     The only reason the defendant officers and/or Sikeston would make the false statements contained in paragraphs 120 through 128 is because if the opposite were true, then they would have been unreasonable and unjustified in utilizing deadly force.

130.    The defendant officers tampered with critical pieces of evidence by destroying potential gun residue on their hands, Taylor's hands, blood, and/or other DNA evidence, as well as compromising the integrity of their weapons, which had significant probative evidentiary value.

131.    The defendant officers failed to undergo, and defendant City failed to conduct, a proper, fair, and impartial investigation into the killing of Taylor. Such failures are consistent with the policy, practice and/or custom of defendant City and defendant McMillan to allow misconduct with impunity.

132.    Upon information and belief, defendant McMillan had knowledge that the defendant officers (1) used excessive force against Taylor, (2) attempted to cover it up through a concocted version of events, and (3) otherwise violated Taylor's constitutional rights by failing to reprimand the defendant officers in any way or take corrective measures thereby ratifying and furthering their unconstitutional actions.

133.    Upon information and belief, defendant McMillan had knowledge that the defendant officers tampered with critical pieces of evidence by destroying potential gun residue on their hands, blood, and/or DNA evidence, as well as compromising the integrity of their weapons, which had significant probative evidentiary value, and by failing to reprimand the defendant officers in any way or take corrective measures thereby ratifying and furthering their unconstitutional actions.

134.    Upon information and belief, defendant McMillan had knowledge that the physical and forensic evidence as well as the body camera footage did not comport with the defendant officers' concocted accounts of what led to the killing of Taylor, but he failed to reprimand them in any way or take corrective measures thereby ratifying and furthering their unconstitutional actions.

135. Defendant McMillan created an environment that openly permitted Sikeston officers to engage in unconstitutional and unlawful conduct as cited above with impunity, and said impunity directly led to the deprivation of constitutional rights of Taylor and other citizens.

136. Because Defendant McMillan created the aforesaid environment and failed to take any affirmative or corrective measures thereof, he (1) exhibited reckless indifference to the rights of Taylor and the citizens of the City of Sikeston, (2) acted in bad faith and/or (3) acted with a malicious intent to continue the pattern of disparate treatment of African-Americans and the use of excessive force.

137. Defendant City ratified the defendant officers' misconduct by failing to reprimand them for (1) interfering with an internal investigation, (2) tampering with evidence, and/or (3) destroying evidence.

138. The defendant officers' verbal choices and misrepresentations reflect both the pervasive racial-animus and the racially-biased mentality and culture created, promulgated, and ratified by defendant Sikeston, defendant McMillan, its police officers, supervisors, and support staff.

139. As discussed more fully herein, such racial-animus and racially-biased mentality was frequently manifested in both thought and ideology, and in both verbal and written forms in Sikeston.

140. This racial-animus and racially-biased ideology was also manifested in actions such as unconstitutional stops and/or detentions and the excessive use of force against African-American citizens, of which defendant McMillan and defendant City had constructive or first-hand knowledge. Through and with such knowledge, defendant McMillan and defendant City created, promulgated, and effectively ratified and furthered the goals of said misconduct, which was also

bolstered by their failure to intervene or to take any corrective actions. All of this constitutes ratification of said misconduct thereby exhibiting reckless indifference, bad faith, and malice toward the citizens of Sikeston including decedent Taylor.

141.    The prominence of racial-animus and bias in decision-making and actions levied against African-American citizens is supported by factual analysis of anecdotal individual incidents and statistical evidence.

142.    For example, defendant officers' false statements regarding this incident support a finding that defendant City, and in particular its police department, had a pattern, practice or custom, as well as a policy, of racial bias aimed at African-American citizens that deprived them of their constitutional rights; namely, to be free of racism manifesting in acts of excessive force against their persons and depriving them of the most fundamental of all constitutionally guaranteed rights: the right to life. Defendant McMillan had knowledge of said instances and findings yet failed to intervene or to take any corrective actions. By doing so, defendant McMillan created, promulgated, and effectively ratified and furthered the practice of said misconduct thereby exhibiting reckless indifference, bad faith, and malice toward the citizens of Sikeston including decedent Taylor.

143.    Moreover, defendant City engaged in a pattern or practice of racial bias and that avoidable harms were levied against African-American citizens in a disproportionate number. Defendant McMillan had knowledge of said instances and findings yet failed to intervene or to take any corrective actions. By doing so, defendant McMillan created, promulgated, and effectively ratified and furthered the practice of said misconduct thereby exhibiting reckless indifference, bad faith, and malice toward the citizens of Sikeston including decedent Taylor.

144.    A pattern and practice of unconstitutional stops, detentions, uses of force, wrongful prosecution, wrongful convictions, wrongful imprisonments, and unfair policing in general permeated throughout the City, including but not limited to the Sikeston Department of Public Safety. Defendant McMillan had knowledge of said instances and findings yet failed to intervene or take any corrective actions. By doing so, defendant McMillan created, promulgated, and effectively ratified and furthered the practice of said misconduct thereby exhibiting reckless indifference, bad faith, and malice toward the citizens of Sikeston including decedent Taylor.

145.    Furthermore, the Sikeston Department of Public Safety's practices are due partly to insidious discrimination, evidenced by racial bias and racial stereotyping utilized by Sikeston police officers toward African-American citizens. Defendant McMillan had knowledge of said instances and findings yet failed to intervene or to take any corrective actions. By doing so, defendant McMillan created, promulgated, and effectively ratified and furthered the practice of said misconduct thereby exhibiting reckless indifference, bad faith, and malice toward the citizens of Sikeston including decedent Taylor.

146.    Defendant Sikeston's pattern of racial bias results in unconstitutional violations of African-Americans, including vehicle stops without reasonable suspicion, arrests without probable cause, unequal treatment, and the use of unreasonable force, all in violation of the Fourth and Fourteenth Amendment of the U.S. Constitution. Defendant McMillan had knowledge of said instances and findings yet failed to intervene or to take any corrective actions. By doing so, defendant McMillan created, promulgated, and effectively ratified and furthered the practice of said misconduct thereby exhibiting reckless indifference, bad faith, and malice toward the citizens of Sikeston including decedent Taylor.

147.    As a direct and proximate result of defendants' wrongful acts and omissions, Taylor died and experienced conscious pain and suffering from the time he was shot until the time he died.

148.    As a direct and proximate result of defendants' wrongful acts and omissions, Taylor's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection and support in an amount to be determined by a jury.

149.    The City of Sikeston affirmatively waived any sovereign immunity rights pursuant to statutes 537.600 as defendant City specifically purchased insurance to cover the type of injuries and damages alleged in the instant lawsuit.

150.    Upon information and belief, defendant City of Sikeston specifically purchased insurance for the purpose of paying for bodily injury claims, personal injury claims, and to compensate individuals for claims against law enforcement officers and the City and said insurance policy was in effect at the time of the incident.

151.    The specific insurance policy which applies this this case is provided by State National Insurance Company – Policy #BPF-PK-101261-02 – Law Enforcement Liability policy.

## COUNT I
**Failure to Properly Hire, Train, Supervise, Discipline, Retain or Otherwise Properly Equip and Failure to Conduct a Fair and Impartial Investigation (Defendant City and Defendant McMillan)**

152.    Plaintiffs re-allege and incorporate the foregoing paragraphs as if fully set forth herein.

153.    Defendants City and McMillan have a ministerial duty to provide responsible and effective operations of its police department.

154.    Defendants City and McMillan also have a ministerial duty to establish proper policies, customs, and regulations of the police department, including but not limited to, in how to conduct their law enforcement arrests in a reasonable and prudent way, in order to protect Taylor's constitutional rights.

155.    Upon information and belief, prior to the death of Taylor, defendants City and McMillan had a custom or policy of negligently hiring and retaining officers, failing to properly train, discipline and/or supervise officers in the use of deadly force in areas of the city of Sikeston predominantly populated by African-Americans, failing to otherwise properly equip officers, and in failing to conduct fair and impartial investigations. Defendant McMillan had knowledge of said instances and findings yet failed to intervene or to take any corrective actions. By doing so, defendant McMillan created, promulgated, and effectively ratified and furthered the practice of said misconduct thereby exhibiting reckless indifference, bad faith, and malice toward the citizens of Sikeston including decedent Taylor. This is supported by the fact that defendant McMillan only began to change the direction of the City's policing African-Americans over a year after Taylor's death.

156.    Defendant McMillan failed to ensure the defendant officers had the proper training, instruction, supervision and oversight, so as to ensure that they did not negligently use excessive force in an unlawful manner.

157.    Upon information and belief, prior to the death of Taylor, defendants City and McMillan had a custom or policy of negligently failing to train or supervise officers regarding the duty to immediately provide first aid to victims of excessive force. Defendant McMillan had knowledge of said instances and findings yet failed to intervene or to take any corrective actions. By doing so, defendant McMillan created, promulgated, and effectively ratified and furthered the

practice of said misconduct thereby exhibiting reckless indifference, bad faith, and malice toward the citizens of Sikeston including decedent Taylor.

158.    Upon information and belief, prior to the death of Taylor, defendants City and McMillan had a custom or policy of negligently failing to train or supervise officers regarding how to treat and properly serve in areas of the city of Sikeston predominantly populated by African-Americans. Defendant McMillan had knowledge of said instances and findings yet failed to intervene or to take any corrective actions. By doing so, defendant McMillan created, promulgated, and effectively ratified and furthered the practice of said misconduct thereby exhibiting reckless indifference, bad faith, and malice toward the citizens of Sikeston including decedent Taylor. This is supported by the fact that defendant McMillan only began to change the direction of the City's policing African-Americans over a year after Taylor's death.

159.    Upon information and belief, prior to the death of Taylor, defendants City and McMillan had a custom or policy of negligently failing to train or supervise officers in cultural diversity in an effort to eliminate the potential of unjustified deadly force in areas of the city of Sikeston predominantly populated by African-Americans. Defendant McMillan had knowledge of said instances and findings yet failed to intervene or to take any corrective actions. By doing so, defendant McMillan created, promulgated, and effectively ratified and furthered the practice of said misconduct thereby exhibiting reckless indifference, bad faith, and malice toward the citizens of Sikeston including decedent Taylor. This is supported by the fact that defendant McMillan only began to change the direction of the City's policing African-Americans over a year after Taylor's death.

160.    The wrongful death of Taylor was directly and proximately caused by the failures of defendants City and McMillan to fulfill their ministerial duties and, as such, produced or

contributed to police officers' devaluation of African-American life in the city of Sikeston, resulting in reckless indifference, bad faith, and malice toward the citizens of Sikeston including decedent Taylor.

## COUNT II
### Unconstitutional Stop and/or Detention and Use of Excessive Force in Violation of Amendments IV and XIV of the United States Constitution and 42 U.S.C. § 1983 (Defendants Golightly, Cotner and Broom)

161.    Plaintiffs re-allege and incorporate the foregoing paragraphs as if fully set forth herein.

162.    This Count is being brought against defendants Golightly, Cotner and Broom in their individual and official capacities, pursuant to the United State Constitution Amendments IV and XIV and 42 U.S.C. § 1983 and § 1988.

163.    At all times material hereto, defendants Golightly, Cotner and Broom were employees of defendant City and were acting within the course and scope of their employment with the same and acting under color of law.

164.    On April 29, 2020, defendants Golightly, Cotner and Broom unlawfully detained and/or seized Taylor.

165.    Defendants Golightly, Cotner and Broom each used unnecessary and excessive force on Taylor depriving him of bodily integrity, life, liberty, and due process of law.

166.    Upon information and belief, the decision to approach Taylor and to violate his constitutional rights was due in part to the fact that Taylor was African-American.

167.    Defendants Golightly, Cotner and Broom each made false statements in their descriptions of how Taylor was acting as they approached him.

168.    Such false statements did not provide the defendant officers with the lawful authority to conduct a stop or detain Taylor.

169.     Defendants Golightly, Cotner and Broom escalated the situation by (1) yelling at Taylor; (2) drawing and pointing their firearms at Taylor; (3) walking towards Taylor while yelling with their firearms drawn; and (4) shooting Taylor, who was unarmed.

170.     This unlawful interaction culminated with the defendant officers firing approximately forty (40) shots at Taylor as he began to comply with their orders to show his hands: three (3) shots while Taylor was standing still far away from the officers, and thirty-seven (37) shots while Taylor was on the ground.

171.     Of the approximately forty shots fired, the defendant officers shot Taylor's body twenty-eight (28) times.

172.     The use of force exhibited by the defendant officers was unreasonable and excessive.

173.     As a direct and proximate result of said defendant City and defendant Golightly, Cotner and Broom's acts, omissions, and use of excessive force, Taylor was deprived of his rights to be free from unreasonable detention, due process of law, equal protection, and the right to life guaranteed to him by the Fourth and Fourteenth Amendments of the United States Constitution.

**<u>COUNT III</u>**
**Defendant City's Custom/Policy/Pattern/Practice of Unreasonable Stops and Detentions and Use of Excessive Force in Violation of Amendments IV and XIV of the United States Constitution and 42 U.S.C. § 1983**

174.     Plaintiffs re-allege and incorporate the foregoing paragraphs as if fully set forth herein.

175.     This Count is being brought against defendant City pursuant to the United States Constitution Amendments IV and XIV and 42 U.S.C. § 1983 and § 1988.

176.     Prior to April 29, 2020, defendant City developed and maintained policies, customs or practices exhibiting deliberate indifference to the constitutional rights of persons in the

community, including systemic deprivation of Fourth and Fourteenth Amendment rights, which caused the violation of Taylor's constitutional rights.

177.    Defendant City maintained a policy, custom, or practice of (1) conducting unconstitutional stops or detentions, (2) use of excessive force, (3) engaging in discriminatory conduct aimed at the African-American community resulting in disparate treatment, (4) failing to properly supervise and train officers on lawful detentions and uses of force, as well as the constitutional requirement of equal treatment, (5) failing to conduct fair and impartial investigations into officers' use of excessive force, and (6) failing to punish officers engaging in constitutional violations, thereby ratifying such conduct.

178.    Defendant City was aware of problems with employees' acting under the color of law, use of excessive force, and, as an employer, it failed to investigate and/or reprimand such behavior and failed to discharge said officers for their misconduct, thereby ratifying such conduct.

179.    Defendant City maintained a policy, custom, or practice of failing to properly train its police officers, including but not limited to, how to use appropriate levels of force; how to properly assess levels of threat; and how to properly issue verbal commands.

180.    Defendant City also maintained a policy, custom, or practice of failing to conduct fair and impartial investigations into officer misconduct, use of excessive force, and police shootings.

181.    Additionally, defendant City maintained a policy, custom, or practice of treating African-American citizens differently, including the use of excessive force. Similarly situated individuals were not stopped, arrested or subjected to excessive force in the same manner and frequency as African-American citizens.

182.     The above said acts of misconduct were perpetuated, tolerated, and not reprimanded by defendant City. Thus, defendant City inadequately discouraged constitutional violations perpetrated by its police officers. As such, Taylor's constitutional rights were violated pursuant to the United States Constitution Amendments IV and XIV, and he was ultimately deprived of his bodily integrity; namely, his right to life.

183.     As a result of the above-mentioned policies, customs, and practices, defendant City fostered an environment wherein police officers believed that their inappropriate actions would not be subject to proper monitoring by supervisors. They also believed that their inappropriate actions would not be subject to proper investigations or lead to any kind of sanction, but would instead be tolerated by defendant City.

184.     The above facts denote a deliberate indifference on the part of defendant City to uphold the constitutional rights of some citizens of the city of Sikeston, as well as those visiting it.

**COUNT IV**
**Substantive Due Process Deprivation in Violation of the Amendment XIV of the United States Constitution and 42 U.S.C. § 1983**
**(Defendants Golightly, Cotner and Broom)**

185.     Plaintiffs hereby incorporate all paragraphs above as though fully set forth herein.

186.     This Count is being brought against defendants Golightly, Cotner and Broom in their individual capacities, pursuant to the United States Constitution Amendment XIV and 42 U.S.C § 1983 and § 1988.

187.     At all times material hereto, the defendant officers were employees of defendant City and acting within the course and scope of their employment with same, as well as acting under color of law.

188.     Plaintiffs, D.T., A.T., B.T., all minors, by and through their parent and next friend Jackson, and Kelly had a cognizable interest under the due process clause of the Fourteenth

Amendment of the United States Constitution in being free from state actions that cause an unwarranted interference with their fundamental right to a familial relationship with decedent Taylor, which is deeply rooted in this Nation's history and tradition.

189.    The defendant officers deprived plaintiffs of their right to a familial relationship with their father and son Taylor in a manner that shocked the conscience of the community.

190.    Namely, when Taylor was unarmed with his hand up, the defendant officers fired forty (40) bullets at him, striking him twenty-eight (28) times and ultimately killing him.

191.    Before Taylor died, the defendant officers failed to timely perform any life-saving measure on him.

192.    Defendant City and the defendant officers left Taylor's mutilated body in the streets, handcuffed and face down in a puddle, for the community to stare, spectate, and gawk. Defendant Golightly lit and smoked a cigarette as decedent Taylor lay in the street bleeding out. In so doing, the defendant officers acted with deliberate indifference to the constitutional rights of the decedent and plaintiffs without any legitimate law enforcement objective.

193.    As a direct and proximate result of said defendant officers' acts, omissions, and deliberate indifference to plaintiffs' constitutional right to their familial relationship with their father and son, plaintiffs have been deprived of the life-long love, companionship, comfort, support, society, care and sustenance of decedent, and will continue to be so deprived for the remainder of their natural lives.

194.    Plaintiffs loved Taylor, their natural father and son, and plaintiffs have suffered extreme and severe mental anguish and pain and have been injured both in mind and in body.

195.    Plaintiffs have ongoing and continuous permanent damages and injuries, and as such are entitled to recovery and damages.

## COUNT V
**Defendant City's Unconstitutional Custom/Policy/Pattern/Practice of Substantive Due Process in Violation of the Amendment XIV of the United States Constitution and 42 U.S.C. § 1983**

196.     Plaintiffs hereby incorporate all paragraphs above as though fully set forth herein.

197.     This Count is being brought against defendant City pursuant to the United States Constitution Amendment XIV and 42 U.S.C § 1983 and § 1988.

198.     Prior to April 29, 2020, defendant City developed and maintained policies, customs, or practices exhibiting deliberate indifference to the constitutional rights of persons in the community, which caused the violation of plaintiffs' constitutional rights under the due process clause of the Fourteenth Amendment of the United States Constitution, which protects individuals from unwarranted state interference of their right to familiar relationship.

199.     Defendant City maintained a policy, custom, or practice of excessive force against citizens including inadequately and improperly investigating citizen complaints of police misconduct, and failing to properly hire, train, and supervise Sikeston officers.

200.     Defendant City was aware of problems with employees' uses of excessive force, yet effectively ratified such conduct by failing to investigate and/or reprimand such behavior, and by failing to discharge said officers for their misconduct.

201.     Defendant City maintained a policy, custom, or practice of failing to properly train Sikeston officers, including but not limited to how to properly respond to situations, how to evaluate threat and appropriate uses of force, and how to conduct themselves without employing racial bias.

202.     Defendant City maintained a policy, custom, or practice of treating African-Americans differently, including excessive use of force.

203.    The above said acts of misconduct were perpetuated, tolerated, and not reprimanded by defendant City. Thus, defendant City inadequately discouraged constitutional violations perpetrated by its law enforcement officers but instead ratified such misconduct, including the use of excessive force.

204.    The above facts denote a deliberate indifference on the part of defendant City to uphold the constitutional rights of citizens of the city of Sikeston, including plaintiffs. Namely, when Taylor was unarmed and held his hand up, the defendant officers fired forty (40) shots at him that ultimately struck him twenty-eight (28) times, and they also failed to provide him first aid.

205.    The defendant officers left Taylor's mutilated body lying face down in a puddle for the world to stare, spectate and gawk.

206.    Defendant City's aforementioned actions and inactions directly and proximately denied Plaintiffs substantive due process and caused the violation of Plaintiffs' fundamental right to a familial relationship with their father and son, Taylor, which is deeply rooted in this Nation's history and tradition.

207.    As such, Plaintiffs' constitutional rights were violated pursuant to the United States Constitution Amendment XIV.

208.    As a result of the above-mentioned policies, customs and/or practices, defendant City's police officers believed that their inappropriate actions would not be subject to proper monitoring by supervisors, and that misconduct would not be subject to investigation or sanctions, but would instead be tolerated by defendant City.

209.    As a direct and proximate result of said defendant City's act, omissions, and deliberate indifference to Plaintiffs' constitutional right to their familial relationship with their

father and son, Plaintiffs have been deprived of the life-long love, companionship, comfort, support, society, care and sustenance of decedent, and will continue to be so deprived for the remainder of their natural lives.

210.    Plaintiffs loved Taylor, their natural father and son, and Plaintiffs have suffered extreme and severe mental anguish and pain and have been injured both in mind and in body.

211.    Plaintiffs have ongoing and continuous permanent damages and injuries, and as such as entitled to recovery of damages.

## PRAYER FOR RELIEF

WHEREFORE, for all of the foregoing reasons, Plaintiffs respectfully request that this court award damages, jointly and severally, against defendants City, McMillan, Golightly, Cotner and Broom pursuant to the Missouri Constitution and statutes and the United States Constitution, and any and all other and further relief as this Court may deem just and appropriate, including but not limited to the following:

(1)    Loss of love, companionship, affection, care, and society;

(2)    Loss of future support;

(3)    Conscious pain and suffering;

(4)    Compensatory damages in an amount in excess of seventy-five thousand dollars ($75,000.00), together with post-judgment interest and costs;

(5)    Punitive damages against McMillan, Golightly, Cotner and Broom for violations of 42 U.S.C. § 1983; and

(6)    Award reasonable attorney's fees and costs to Plaintiffs.

## TRIAL BY JURY

WHEREFORE, Plaintiffs hereby demand a trial by jury on all issues so triable.

**KUHLMAN & LUCAS LLC**

By:    */s/ Melissa K. Donlon*
Chad C. Lucas          #50822
Melissa K. Donlon     #71745MO
4700 Belleview Ave., Suite 300
Kansas City, MO 64112
Telephone: (816) 799-0330
Facsimile: (816) 799-0336
Email: chad@kuhlmanlucas.com
          melissa@kuhlmanlucas.com